## Case No. 825.

### The BALTIC.

[10 Ben. 631.] [1]

District Court, S. D. New York. Nov., 1879.

#### COLLISION—DAMAGES—AGREEMENT TO REPAIR—DEMURRAGE.

1. A bark, having been injured by a collision with a steamer, arrived in New York, where the agents of the steamer repaired the damages. The owners of the bark then filed a libel to recover demurrage for the detention of the bark while being repaired. The owners of the steamer set up that it was agreed that the repairing of the damages should be in full satisfaction of the claim. They also claimed that they could have hurried the repairs so as to have finished them in much less time, if the master of the bark had informed them of an offer of a charter which it appeared he had and which he refused because he was not certain that his vessel would be ready in time to begin to load under it: *Held*, that the burden was on the steamer to establish the agreement that the making the repairs should be in full satisfaction for all damages, and that on the evidence she had not established it.

2. That the master of the bark was not bound to have communicated to the agents of the steamer the offer of a charter which he had had; that his refusal to accept it was in good faith, and that the libellants were entitled to recover demurrage for the detention of the bark.

[In admiralty. Libel against the steamer Baltic to recover damages for a collision, with demurrage. Decree for libellant.]

Thos. E. Stillman, for libellant.

E. P. Wheeler, for claimant.

CHOATE, District Judge. This is a libel to recover damages for a collision which occurred between the Norwegian bark Plutarch, of which this libellant was master and part-owner, and the steamer Baltic, on the 2d day of June, 1879, while the bark was bound on a voyage from Bordeaux to New York in ballast. The libel avers that "the bark continued on her voyage, and, on or about the 19th day of June, arrived in the port of New York; that the owners of the said steamer then assumed and superintended the repairs to the bark necessary to fit

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

her for sea, and agreed to pay therefor; that the said bark, pending the completion of said repairs, was unfit for sea, and her owners lost the use and employment of her and were subjected to considerable expense for the maintenance and wages of the crew during the said period and for wharfage and other expenses." No question is made as to the responsibility of the Baltic for the collision, and it was shown that the repairs were paid for by her owners. The only question is whether she is liable for the detention of the vessel during her repairs. On this point the answer avers, (2d), "immediately on the arrival of the said bark in the port of New York at the termination of the voyage mentioned, it was agreed between the libellant and this claimant that this claimant should make, at its own expense, all the repairs necessary to restore the said bark to as good a condition as she was in before the said collision, and that the said libellant should allow the said claimant to make the same, and that the making by the said claimant at its own expense of the said repairs should be in full satisfaction and discharge of the said supposed cause of action alleged in the said libel and of all damages sustained by the libellant or by the owners of the said bark by reason thereof." The answer then avers performance of this agreement on claimant's part. It also avers, (3d), "immediately after the arrival of the said bark in this port, as aforesaid, this claimant offered to prosecute the same (i. e., the repairs), day and night, and this claimant offered that its said workmen should accompany said bark if it should go to any place in search of cargo, and it could have completed the said repairs in the space of three days, but the libellant then and there informed the claimant that the rates of freight were then so low that he preferred not to accept the same, nor to charter the said bark at that time, but to wait until such rates of freight should rise, and that the said claimant should and might make the said repairs at its own convenience; that the claimant, relying on the said statement so made, used only ordinary and reasonable diligence in and about repairing the said bark, and did not use extraordinary diligence in and about the same, as otherwise it would and could have done, and said vessel could easily have been taken from the pier at which she was lying to any other pier or port and have taken on cargo while said repairs were going on."

The proof is that before the arrival of the bark the claimant's agent sent a letter to be delivered to her master by the pilot, requesting him, immediately on his arrival, to call at the office of the respondent company, the owners of the Baltic, and that the claimant had also instructed a competent mechanic to be ready to have her repaired on her arrival. She arrived on Thursday the 19th of June, and on Saturday, the 21st, this libellant, her master, and his consignee, Mr.

Boyesen, called at the office of the claimant company and there met Mr. Cortis, the managing agent of the company. The agreement set up in the second article of the answer that the claimant should repair the bark and that this should be in full satisfaction of all claim for damages by reason of the collision, was made orally during that conversation, if at all. There are three witnesses to what took place at that time, Mr. Cortis, Mr. Boyesen and the libellant. It is insisted on behalf of the claimant that the fair result of the testimony, considered in the light of the surrounding circumstances, is that the parties reached an understanding to the effect set forth as an agreement in the second article in the answer, although it is conceded that nothing was said in terms to the effect there set forth as to the repairs being in full satisfaction. This understanding, it is said, is to be properly inferred from the conversation as related by Mr. Cortis. His account is that, when they came in, he addressed the captain and said, "Captain, you had a slight collision on the Banks, I believe," to which the captain answered that he had; that he then said to the captain that it was their steamer, the Baltic, and asked the captain what was the extent of the damage, and the captain replied $800 or $900, he thought; that the captain said that the steamer had been handled in a masterly manner and was commanded by a good man; that he then told the captain that he would send a man on board and have the damages repaired to his satisfaction; that, as the damages were of a nature that would not prevent loading the vessel, the carpenters could go with her wherever he wanted to go to load, so that there would be no detention; that the captain then said he was satisfied, or all right, or something to that effect, and bade him good morning and left.

By the testimony of the captain and of Mr. Boyesen it appeared that when the subject was introduced and Mr. Cortis admitted that it was the Baltic which collided with the Plutarch, Mr. Cortis did not admit that it was the fault of the Baltic, but said in effect, "I don't know, captain, who is in fault in this business, but any way I will repair it for you." To which the captain said "all right" or "thank you." The testimony of Mr. Boyesen and of the captain is inconsistent with there having been anything said about the carpenters accompanying the ship so that there need be no detention, from which remark especially the inference is drawn of a waiver of all claim for demurrage and the acceptance of the agreement to repair as a full satisfaction. The witnesses are all of unquestioned character and intelligence. Upon the whole testimony I am not satisfied that any such remark was made or that the captain or Mr. Boyesen came away from the interview with any understanding on their part that what was offered to be done by the company was offered in

full satisfaction, or with any condition that the captain should waive any claim he might have for demurrage, or that anything was said which should have led them to believe that that was Mr. Cortis's meaning or understanding. The defence set up is the making of a special agreement, as to which the burden of proof is on the claimant, and that burden he has not sustained. Nor is such an agreement to be inferred from the circumstances under which the offer to repair was made. Very likely Mr. Cortis had the idea in his own mind that he would avoid all claim for demurrage by promptly offering to repair the bark, and if no detention had in fact occurred, the course taken by him, which is certainly to be commended, would have had this effect. That he now thinks the subject was mentioned does not admit of any doubt, but the minds of the parties did not meet, so as to form a contract binding on them.

The evidence as to the detention is that before the claimant had commenced the repairs, the libellant, who came to this port with the intention of carrying a cargo of petroleum to Europe, was offered a charter by a broker, and that he refused it because he was not certain when the vessel would be repaired, and by the charter-party he would be obliged to agree to be ready for sea by the 16th of July, and to begin to load about ten days before that. He did not communicate this offer or the rejection of it to the claimant. No other charter offered till the 8th of July, when the repairs being nearly finished, he accepted a charter on the same terms on which the former charter had been offered. The repairs were commenced on the 24th of June and finished on the 11th of July. It was shown that by working night and day they could have been finished in eight working days, or by the 4th of July. The claimant did not offer to have the repairs go on night and day, and for a night's work the wages of the workmen would have been double what they were for a day's work. There was no proof of any special agreement such as is set up in the third article of the libel. It was shown that the vessel could have been safely moved while the repairs were going on and that cargo could in fact have been put on board of her by the 6th of July: that is, the repairs would not have prevented the commencement of her loading on that day and its prosecution afterwards.

It is insisted by the learned counsel for the claimant that the libellant was bound to communicate to the claimant the offer of a charter made to him; that if he had done so the claimant might have given orders for prosecuting the repairs more promptly or might have guaranteed that the vessel would be ready in time to receive her cargo under it; that as the libellant did not communicate this fact he is estopped to claim demurrage. This seems hardly to be the defence intended by the answer, but assuming that it is so, I think there was no duty to communicate the

fact. The libellant could not then know whether even with great diligence he could safely agree to be ready for sea by the 16th of July. Although he knew in a general way the nature of the injury to the vessel, yet until the repairs were commenced it was a matter of uncertainty how long a time they would take. The claimant had proposed what should be done, and if it desired to know of any offers made to the libellant for a charter it could easily have required the information, but in the absence of such request the libellant had no reason to believe that the claimant would make any change in the plans in consequence of this offer. I think his rejection of the offer was made in good faith and not because he was waiting for freights to rise. I see no duty on his part to communicate the offer, under the circumstances of this case. It is also claimed that he informed the claimant that he was waiting for better freights and that the claimant was thereby led not to repair as promptly as it might. It is true that in the law of estoppel in pais "when an act produces conduct from which flows injury, it cannot matter whether that conduct be affirmative or negative, active or quiescent." Continental Nat. Bank v. National Bank of Com., 50 N. Y. 586. There is some evidence that the captain, in conversation with the men employed by the claimant to do the work, said something about his waiting for freights to rise. The captain having been examined before trial, has had no opportunity to testify since this evidence was taken. But I do not think these men stood in such a relation to the matter that what he said to them was any notice to the claimant, nor did the claimant act upon it. There is, therefore, no estoppel growing out of it. And so far as this testimony is relied on as showing that the captain rejected the first offer, not because he thought he could not comply with the terms of the proposed charter. but because he thought freights would improve, I think it is entitled to very little weight and is clearly overborne by the other testimony in the case.

The libellant is entitled to a decree for sixteen days' demurrage, and costs, with a reference to compute the amount, unless the amount is agreed to.